IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MICHIGAN
Southern Division

UNITED STATES OF AMERICA
*ex rel,* Dr. Christian Kreipke,

            Plaintiff,                       Civil Action No. 12-14836

BRINGING THIS ACTION ON BEHALF OF
THE UNITED STATES OF AMERICA

v.                                          Hon. Judge Edmunds

                                          Qui Tam Action

WAYNE STATE UNIVERSITY, and
UNIVERSITY PHYSICIAN GROUP,

                                      **FILED UNDER SEAL PURSUANT TO**
                                      **31 U.S.C. § 3730(b)(2)**

                 Defendants.         **DO NOT PLACE IN PRESS BOX**

                                      **DO NOT ENTER ON PACER**

---

## FALSE CLAIMS ACT COMPLAINT

Plaintiff-Relator Dr. Christian Kreipke, on behalf of himself and the United States of America, alleges as follows:

## I.     NATURE OF ACTION

1.     Dr. Christian Kreipke (hereinafter "Dr. Kreipke"), Plaintiff and Relator, brings this action pursuant to the *qui tam* provisions of the False Claims Act, 31 U.S.C. §§ 3729, *et seq.* to recover treble damages, civil penalties and all other relief available under the Act.

2.     This case involves an egregious, and systematic, scheme involving false claims presented for payment, and false documents submitted in order to get claims paid. As more fully described below, these claims were submitted to the United States government by either, or both, Defendants and are related to their grossly inflated research grant proposals. Defendants profited from this abusive scheme by 1) inappropriately "drawing down" grants by personnel not working on the grant; 2) rapidly "drawing down" grants on non-personnel items; 3) providing false Effort Reporting representations; 4) double billing for seeing Medicare and Medicaid patients when the physician was already fully funded by the Federal Government; 5) and providing false claims related to indirect cost funding provided by the Government.

3.     As a result of Defendants' false statements, false or fraudulent claims, and false submissions, Defendants' wrongfully obtained millions of dollars from the United States government that they were not entitled to receive.

## II.    JURISDICTION

4.     This action arises under the False Claims Act, 31 U.S.C. §§ 3729, *et seq.* This Court has subject matter jurisdiction over this action pursuant to 31 U.S.C. § 3732(a). This court also has jurisdiction pursuant to 28 U.S.C. § 1345 and 28 U.S.C. § 1331.

5.     This court may exercise personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) because Defendants reside and transact business in the Eastern District of Michigan. Additionally, the Defendants committed acts in violation of 31 U.S.C. § 3729 within the judicial district which is the Eastern District of Michigan.

**III. VENUE**

6.     Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) because the acts proscribed by 31 U.S.C. § 3732(a) et seq. and complained of herein took place within this District. Additionally, venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and (c), because at all times material and relevant, Defendants transacted business in this District.

**IV.    PARTIES**

7.     Relator, Dr. Christian Kreipke, is a citizen of the United States and a resident of the State of Michigan. Relator was an employee of Wayne State University. Relator brings this action based on his direct, independent, and personal knowledge and also upon information and belief based on facts known to him.

8.     Relator is an "original source" of the information alleged herein as that term is used in the False Claims Act context.  He has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under the False Claims Act.

9.     Dr. Kreipke is a 35 year-old Ph.D., and was on a tenure-track at the WSU School of Medicine and Rehabilitation. Relator was wrongfully terminated from WSU in 2012. That termination is currently the subject of an unrelated claim/administrative hearing between Relator, Relator's union, and WSU.

10.     Dr. Kreipke has over 40 publications in the area of Cellular and Clinical Neurobiology.  He currently has or has had grants from the NIH, DOD, VA and others.  Further, Dr. Kreipke is on dozens of regional and national professional societies and has won numerous awards in his discipline.  (**Exhibit A** – CV Dr. Kreipke).

11.     Defendant University Physician Group, is a domestic non-profit corporation that in part attends to the billing for Defendant Wayne State University's Hospitals.  Hereinafter the University Physician Group will be referred to as "UPG."  UPG is a 2,000 plus closed group physician practice serving Wayne State University.  UPG also operates clinics and see patients. Dr. Kreipke's research directly benefits patients in the Rehabilitation clinic at UPG.

12.     Defendant Wayne State University ("WSU") is a State funded university that was founded in 1868; WSU consists of 13 schools and colleges offering more than 400 major subject areas to over 32,000 graduate and undergraduate students.  It is currently the third largest university in the state of Michigan and one of the 30 largest universities in the United States. The WSU School of Medicine is ranked 62nd nationally in receipt of NIH funds for the year 2011.  As of December 2011, WSU had over $53,500,000 in NIH grants and contracts for that year alone.

## V.    THE FALSE CLAIMS ACT

13.     The False Claims Act ("FCA") provides in pertinent part that:

> (a)   Any person who (1) knowingly presents, or causes to be presented to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval; (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government (3) conspires to defraud the Government by getting a false or fraudulent claim paid or approved by the Government, ...or (7) knowingly makes, uses or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government.
> * * *

4

is liable to the United States Government for a civil penalty of not less than $5,500 and not more than $11,000, plus 3 times the amount of damages which the Government sustains because of the act of that person. . .

(b)   For purposes of this section, the terms "knowing" and "knowingly" mean that a person, with respect to information (1) had actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required.

31 U.S.C. § 3729

## VI.   DEFENDANTS' FRAUDULENT SCHEMES

14.   **Rapid Draw Down of Grants**:  The rate at which grants may be drawn down is governed by guidelines issued by the Department of Education and the National Institutes of Health.

15.   At WSU, Relator witnessed first hand that the University was rapidly drawing down his grants and other grants by increasing the percent of effort that personnel were spending on the grants in order to draw down the salary amounts and indirect costs at a much greater rate than budgeted.

16.   Because of this scheme, and as described below, the effort reports that were and are submitted to the various federal agencies are false and fraudulent.

17.   Additionally, grant applications require the applicant to identify all key personnel that will perform work on the grant and to budget a salary for those personnel.

18.   In order to cover budget shortfalls in other areas, Defendant WSU allowed personnel to draw salaries from grants on which they were not working.

19.   This was another way WSU caused the grants to be drawn down faster than the budgeted and it caused the submission of false claims for payment related to personnel salaries for persons who performed no work on the grants.

20.     **Fraudulent Effort Reporting:**  The representatives of the Sponsored Programs Administration ("SPA") acting under the direction of the Office of the Vice President of Research ("OVPR") at WSU have signing authority for the principle investigators ("PI"). Pursuant to this signing authority, SPA submitted effort reports with percent effort numbers changed from what was budgeted, and then signed off for the principle investigator.  Relator states that often principal investigators would not get a report until, in some cases, up to a year after grant was awarded.  It was the policy of the departmental financial officer, in the Relator's case, Terri Larrew, to only type a summary.

21.     Overlap, whether scientific, budgetary, or commitment of an individuals effort greater than 100%, is not permitted.  The goals in identifying and eliminating overlap are:  to ensure that sufficient and appropriate levels are committed to the project, that there is no duplication of funding for scientific aims, specific budgetary items, or an individuals level of effort; and, only funds necessary to the conduct of the approved project are included in the award.[1]

22.     Budgetary overlap occurs when duplicate or equivalent budgetary items (e.g. equipment salary) are requested in an application but are already provided by another source.

23.     Commitment overlap occurs when a person's time commitment exceeds 100%, whether or not salary support is requested in the application.  While information on other support is only requested for personnel (excluding consultants), no individuals on the project may have commitments in excess of 100%.  This caused 1) inflated effort on grants over what is reasonable and realistic with other responsibilities (e.g., teaching, service); 2) inflated reporting to some agencies to over-represent the amount of effort faculty place on research (e.g., Carnegie ratings);

---

[1] As will be shown below one individual, Christian Reynolds, was committed at 100% effort on two separate grants. This is clearly fraudulent as nobody can be giving 100% of their work time to two separate grants.

and 3) Deflated reporting to other agencies to minimize salary offset on federal grants with the net result in overpayment of faculty salaries to the university.

24.     When submitting grant application information to the government, WSU researchers, including Relator, were required by WSU to omit their clinical, teaching and service salary and the percent effort they spend performing their clinical, teaching and service duties from the application materials and the subsequent effort reporting materials.[2]

25.     The omission, and inaccuracy, of this information causes the grant application and/or its supporting materials, to be false claims for grant awards.  This also causes the effort reports to be false claims for payment.

26.     This data was omitted from all of the Relator's grant applications and effort reports on Federal grants.  The omission of this data is system-wide at WSU, as mandated by WSU policy, making all grant applications where the researcher omits clinical or teaching salary effort from the application or effort report, false claims for payment.

27.     Relator earns approximately two-thirds of his income from "teaching and service" drawn from "General Fund" as appropriated by the State of Michigan.  Yet, nowhere on his effort reports is any time effort or budget effort reported to the government related to mandated other duties.

28.     Moreover, WSU takes the affirmative position in the policies and procedures it provides to its employees that they are not required to report their teaching, service, or UPG time and income when effort reporting.

---

[2] This is clearly evidenced by the failure of Defendant WSU to include teaching time into the equation when computing a researcher's time. As stated above, the State of Michigan requires that 40% of a tenure track professor's time be devoted to teaching. (**Exhibit N**, p.5). Yet, Relator's individual contract required that he spend 50% of his time teaching. (**Exhibit K** – Dr. Kreipke Contract). However, Defendant WSU submitted grants requesting funds for Relator in excess of his remaining work time. (**Exhibits B-G**). It must be noted that the State of Michigan requires 40% dedication to teaching because it is providing funds for these researchers' salaries.

29.     Thus, there is no doubt that this fraud is system-wide at WSU and UPG.

30.     The federal government is thereby defrauded of millions of dollars through this system wide conduct.

31.     **Inappropriate Medicare Billing for Clinical Costs When the Research Was Already 100% Effort Committed On Grants**:   When a researcher is 100% effort committed to teaching or research, he or she is ineligible to bill for seeing Medicare Part B patients.   This is because the government is already paying for 100% effort by the researcher toward the grants that the government is funding.

32.     For several quarters during which Relator was 100% effort committed to research grants, Defendant UPG submitted bills to Medicare services rendered by Relator and other researchers who were on his grants, through Defendant UPG.

33.     This necessarily led to the overpayment of clinical salaries based on multiple sources of effort (i.e., 1) effort on grants, 2) University reporting of teaching effort, and 3) effort of time billed to Medicare); the net result of which was that the federal government was double or triple billed and was fraudulently forced to overpay these researchers/faculty from federal funds; as a result, all of the Medicare billings by Defendants WSU and UPG under Relator's UPIN number, or those of the other researchers/faculty on these grants, during those quarters, are false claims for overpayment.

34.     Relator, based on his own personal experience, believes this is a systemic problem at WSU and UPG.

35.     **False Claims for Indirect Costs**:   Direct Costs are:  any costs that can be easily identified with a specific project (grant/contract) e.g. salaries, wages, materials, supplies, subcontracts and consultants.

8

36.     Indirect Costs are:  any costs that are not easily identified (or it would not be cost effective to identify) to a specific project, but identified with two or more final cost objectives.

37.     There are three types of indirect costs:  1) Fringe benefits; 2) Overhead; and 3) "G&A."

38.     Fringe Benefits are services or benefits provided to employees, e.g. health insurance, payroll taxes, pension contribution, paid absences, etc.

39.     Overhead is comprised of indirect costs associates with the performance of a project, e.g. facilities costs (rent, heat, electricity, etc.), general laboratory supplies, etc.

40.     "G&A" is defined as indirect costs associated with the overall management of an organization, e.g. President's office, Human Resources Office, Accounting Office, office supplies, etc.  The term "F&A" rate (facilities and administrative rate) is a term synonymous with the indirect cost rate.

41.     With regard to federal grants, direct and indirect costs are distinct and separately funding categories.

42.     The indirect cost rate charged by WSU in its grant applications was approximately 52%.

43.     With regard to Relator's WSU grants, all of the indirect cost money goes through the Provost's office.

44.     WSU's policy is to seek indirect cost reimbursement at the maximum federally approved rates.  Those rates can vary from year to year.  The rate recently has been approximately 52% of the direct costs.

45.     Therefore, for every ($1.00) dollar in fraudulently inflated direct costs WSU receives, it also receives an additional fifty-two cents ($0.52) for indirect costs.

46.     The Provost's office receives all of the grant money from each grant for "indirect costs". The Provost's office then negotiates with each Dean a percentage of the total indirect cost funding that the Provost's office will allow to go to the Dean's office. The Dean then negotiates a percentage with each Departmental Chair.

47.     The Dean then allows part of that percentage to go to the Chair of the Department and the Dean's office keeps part of the money.

48.     Within Relator's department, an unknown percentage of the total indirect cost funding requested in the grants actually went to the department.

49.     Further, Relator was instructed to refrain from including large and very sophisticated equipment, in his grant requests under "direct" costs when submitting grants.

50.     If such an equipment request was made under "direct" costs and approved by the grant governing body, it is understood that these requests without any accompanying "indirect" funds.

51.     During the life of many WSU grants, the equipment would be purchased after the initial budget was approved by the grating agency, with no reporting of the loss of the indirect funding to the granting agency. Additionally, in the case of equipment initially budgeted, often it would never actually be purchased. (See e.g. **Exhibit C**, p. 5 and 57). However, WSU would not return the funds allocated for the equipment to the federal government.

52.     In grants where the equipment was purchased after initial budget was furnished, WSU would charge the individual PI for these costs, alleging that the equipment was "disallowable."

53.     Through this method, WSU would receive funds for the equipment three times; 1) from both the federal government based on the "direct" cost budgeted, 2) the additional "indirect" cost provided, and 3) the individual PI.

54.     Additionally, the individual PIs that have clinical duties are forced to work more clinical hours to cover these "disallowable costs."

57.     So the government is damaged in two ways:  First the money the government has allotted for indirect costs is misappropriated and the claims for payment under the grant are false claims for payment because the Defendants are not using the indirect cost money for the purposes of the grant.  Second, because the PIs are forced to work more clinical hours in order to generate revenue to cover their indirect costs, the PIs have less time to actually work on the grants and the government is not getting the work from the PI for which it is paying.

58.     The misappropriation of indirect grant funds occurs across the board at WSU.

59.     In 2011, Relator believes that Defendants received millions in indirect cost grant funding from the federal government.

**VII.    FRAUD IN GRANTS WHERE RELATOR WAS PI OR CO-PI**

60.     In order to show Relator's direct evidence of the above alleged fraud, Relator will provide information from the specific grants on which he was the PI or Co-PI.

61.     Relator was the **principle investigator** on three (3) grants and the co-principle investigator on another three (3) grants.

62.     Individual Examples (Research Grants) are as follows, and total of over $3,000,000 for these six (6) grants alone:[3]

---

[3] A conservative estimate of the total approximate fraud at WSU is as follows:

***TOTAL AMOUNT OF SUSPECTED FRAUD (Limited to NIH grants)***

| Source of Fraud | # of instances | Amount |
|---|---|---|

a.   Grant Number U01NS072045-01 commonly referred to as "Clazosentan+TBI."

| Grant Number/short title | Agency | Examples of Direct (d) Cost Fraud | Examples of Indirect (i) Cost Fraud | Amount of Suspected Fraud |
|---|---|---|---|---|
| U01NS072045-01/ Clazosentan+TBI | NIH | Inflated salary for PI (Dr. Kreipke); budgeted $155,000 base salary (**Ex.B**, p.5); actual $115,000 (**Ex.K**) | Indirects requested on inflated budget | $11,400 (d) + $5,928 (i) =**$17,328** |
| See **Exhibit B** for documents related to this grant. | | Inclusion of Patrick Mueller ($11,170+indirects budged) | Indirects requested on Patrick Mueller | $11,170 (d) + $5,808 (i) =**$16,978** |
| | | Grossly inflated salaries for 3 technicians ($157,974+ indirects budgeted (**Ex.B**, p.5), actual should be $94,350+indirects (**Ex.B**, p.9 and **Ex. L**, p.2,3) | Indirects requested on grossly inflated salaries of technicians | $63,624 (d) + $33,084 (i) =**$96,708** |
| | | Grossly inflated surgical supplies ($75,000+indirects budgeted (**Ex.B**, p.5), actual $10,000+ indirects (**Ex.B**, p.9 and **Ex. M**)[4] | Indirects requested on grossly inflated surgical supplies | $65,000 (d) + $33,800 (i) =**$98,800** |
| | | Grossly inflated animal costs ($167,700+indirects budgeted (**Ex.B**, p.5), actual $13,000+ indirects needed(**Ex.B**, p.9 and **Ex. L**, p.1) | Indirects requested on grossly inflated animal costs | $154,700 (d) + $80,444 (i) =**$235,144** |
| | | Grossly inflated MRI costs (122,760+indirects budgeted (**Ex.B**, p.5), actual 51,480 needed (**Ex.B**, p.10) | Indirects requested on grossly inflated MRI costs | $71,280 (d) + $37,066 (i) =**$108,346** |

=*$573,304 total suspected fraud*

| Grants | 297 current NIH grants at WSU* | ($502,598**) X 297 = $149,271,606 over 5-year period |
|---|---|---|
| Disallowable Costs | 297 current NIH grants at WSU* | ($30,000**) X 297 = $8,910,000 |
| | | |
| Effort Reporting | 297 current NIH grants at WSU* with average of 2 Key Personnel | ($18,240) X (2Key Personnel) X 297 =$10,834,560 |

*Total Suspected Fraud= $169,016,166*

\* From the NIH reporter (does not take into account grants from agencies other than NIH [e.g., DoD, NSF]; does not take into account grants which have terminated between 2007-2011)

\*\* calculated via averaging fraud over sample population

\*\*\* see accompanying report (Instructional Costs)

[4] The determination of the actual rates that should have been submitted for items like surgical supplies, animal costs, and histological supplies is based on the published accepted rates that Defendant WSU actually provides to PIs/researchers. (**Exhibit L** – WSU Published Rates).

b.     Grant Number U01NS072045-01 **A1** commonly referred to as
"Clazosentan+TBI."

| Grant Number/short title | Agency | Examples of Direct (d) Cost Fraud | Examples of Indirect (i) Cost Fraud | Amount of Suspected Fraud |
|---|---|---|---|---|
| U01NS072045-01 A1/ Clazosentan+TBI | NIH | Inflated salary for PI (Dr. Kreipke); budgeted $157,668 base salary (**Ex.C**, p.5); actual $115,000 (**Ex.K**) | Indirects requested on inflated budget | $12,206 (d) + $6,347 (i) =**$18,553** |
| See **Exhibit C** for documents related to this grant. | | Inclusion of Patrick Mueller ($12,002+indirects budged (**Ex.C**, p.5) when he did no work | Indirects requested on Patrick Mueller | 12,002 (d) + $6,241 (i) =**$18,243** |
| | | Grossly inflated salaries for 3 technicians ($183,150+indirects budgeted[5] (**Ex.C**, p.5), actual should be $94,350+ indirects (**Ex.C**, p.10 and **Ex. L**, p.2,3) | Indirects requested on grossly inflated salaries of technicians | $88,800 (d) + $46,146 (i) =**$134,976** |
| | | Grossly inflated surgical supplies ($75,000+indirects budgeted (**Ex.C**, p.5), actual $10,000+ indirects (**Ex.C**, p.10 and **Ex. M**) | Indirects requested on grossly inflated surgical supplies | $65,000 (d) + $33,800 (i) =**$98,800** |
| | | Grossly inflated histological supplies($15,000+ indirects budgeted (**Ex.C**, p.5), actual $3,000+indirects (**Ex.C**, p.10) | Indirects requested on grossly inflated histological supplies | $12,000 (d) + $6,240 (i) =**$18,240** |
| | | Grossly inflated animal costs ($205,000+indirects budgeted (**Ex.C**, p.5, 72), actual $13,000+indirects needed (**Ex.C**, p.5 and **Ex. L**, p.1) | Indirects requested on grossly inflated animal costs | $192,000 (d) + $99,840 (i) =**$291,840** |
| | | Grossly inflated MRI costs (169,000+indirects budgeted (**Ex.C**, p.5), actual 51,480 needed (**Ex.C**, p.10) | Indirects requested on grossly inflated MRI costs | $117,520 (d) + $61,110 (i) =**$178,630** |

=**$759,282 total suspected fraud**

c.     Grant Number R01NS064976-01 A2.

| Grant Number/short title | Agency | Examples of Direct (d) Cost Fraud | Examples of Indirect (i) Cost Fraud | Amount of Suspected Fraud |
|---|---|---|---|---|
| R01NS064976-01 A2 | NIH | Request for 60% effort for Dr. Kreipke (60% effort violates | Indirects requested on maximum | ~**$200,000** |

---

[5] The difference between the technician salaries in (a) and (b) is an unexplained raise given to Christian Reynolds (**Ex.B**, p.5) who had actually transferred to another lab, in a different department by the time this grant application had been submitted.

13

| | | | | |
|---|---|---|---|---|
| | | contract in which only 40% effort may be devoted to research) (**Ex.D**, p.41). Again this is in violation of the 40% max effort cap, and also completely ignores the other grants, teaching, and service he was working on. | module allowed ($250,000/year) | |
| See **Exhibit D** for documents related to this grant. | | Inclusion of Donald Kuhn (1.8 cal. Months, approx. 15% effort) when he did no work, and was on multiple other grants. (**Ex.D**, p.41). | Indirects requested on maximum module allowed ($250,000/year) | ~$200,000 |
| *NOTE: Grant requested five (5) $250,000 modules while four (4) with less increment would suffice* | | Inclusion of Mark Haacke (consultant) (Note inclusion was mandated since he was Director of MRI facility even though Dr. Kreipke and his technicians were fully trained, and when he did no work). (**Ex.D**, p.41). | Indirects requested on maximum module allowed ($250,000/year | ~$50,000 |
| | | | Indirects calculated on total modules without regard for items not receiving indirects (**Ex.D**, p.38). | ~$50,000 |

**=$500,000 total suspected fraud**

d. Grant Number R01NS039860-09 A2/, commonly referred to as "Control + TBI."

| Grant Number/short title | Agency | Examples of Direct (d) Cost Fraud | Examples of Indirect (i) Cost Fraud | Amount of Suspected Fraud |
|---|---|---|---|---|
| R01NS039860-09 A2/ Control + TBI<br><br>See **Exhibit E** for documents related to this grant. | NIH | Inclusion of Donald Kuhn (1.8 cal. Months, approx. 15% effort) when he did no work, and was on multiple other grants. (**Ex.E**, p.11, 12). | Indirects requested on maximum module allowed ($250,000/year) | ~$200,000 |
| *NOTE: Grant requested five (5) $250,000 modules while four (4) with less increment would suffice* | | | Indirects calculated on total modules without regard for items not receiving indirects. (**Ex.D**, p.35). | ~$50,000 |
| | | Inclusion of Mark Haacke (consultant) (Note inclusion was mandated since he was Director of MRI facility even though Dr. Kreipke and his technicians were | Indirects requested on maximum module allowed (250,000/year | ~$50,000 |

| | | fully trained) (**Ex.E**, p.12). | | |
|---|---|---|---|---|

***=$300,000 total suspected fraud***

    e.    Grant Number R01NS073603-01, commonly referred to as "Polypathology and TBI."

| Grant Number/short title | Agency | Examples of Direct (d) Cost Fraud | Examples of Indirect (i) Cost Fraud | Amount of Suspected Fraud |
|---|---|---|---|---|
| R01NS073603-01/ Polypathology and TBI | NIH | Inclusion of Donald Kuhn (1.8 cal. Months, approx. 15% effort) when he did no work, and was on multiple other grants.  (**Ex.F**, p.11). | Indirects requested on maximum module allowed ($250,000/year) | ~$150,000 |
| See **Exhibit F** for documents related to this grant. | | Inclusion of Christian Reynolds (12 cal. Months) (already committed 100% effort on another grant) when he did no work. (**Ex.F**, p.36). | Indirects requested on maximum module allowed ($250,000/year) | ~$200,000 |
| ***NOTE:  Grant requested five (5) $250,000 modules while four (4) with less increment would suffice*** | | | Indirects calculated correctly WITH full regard for costs which are not "indirect" generating (e.g. equipment) (**Ex.F**, p.33). | |
| | | Inclusion of Mark Haacke (consultant) (Note inclusion was mandated since he was Director of MRI facility even though Dr. Kreipke and his technicians were fully trained) (**Ex.F**, p.12). | Indirects requested on maximum module allowed (250,000/year | ~$50,000 |

***=$400,000 total suspected fraud***

    f.    Grant Number R01NS069937-01.

| Grant Number/short title | Agency | Examples of Direct (d) Cost Fraud | Examples of Indirect (i) Cost Fraud | Amount of Suspected Fraud |
|---|---|---|---|---|
| R01NS069937-01 | NIH | Grossly inflated material costs (budgeted $98,000+indirects for first year and $98,000+ indirect +3% inflation each subsequent year (**Ex.G**, p.33); actual needed ~$140,000 +indirects total (**Ex. M**) | Indirects requested on grossly inflated materials and supplies | $375,000 (d) + $195,000 (i) =**$570,000** |
| See **Exhibit G** for documents related to this grant. | | Inclusion of ~$5,000 per year for equipment maintenance (should be an "indirect" cost and not | Indirects calculated on ~25,000 for equipment | **$13,000** |

| | | calculated as a "direct" cost) (**Ex.G**, p.33). | maintenance | |
|---|---|---|---|---|

*=$583,000 total suspected fraud*

63.     As can be seen from the above tables and supporting documentation, individuals like Donald Kuhn, Christian Reynolds, Mark Haacke, and Patrick Mueller were budgeted to perform work on these grants and received grants funds for their work from the federal government.  Yet, they did not perform any work on these grants and WSU allowed them to draw salaries on these grants.

64.     Indeed, upon information and belief, these individuals could not have worked the hours provided in the grant applications, on any of these grants, as 100% of their committable time was already allocated to other endeavors, including, but not limited to, other grants, teaching, clinical work, and service.

65.     Further, WSU inflated the direct costs related to these grants by inflating the salaries of the individuals named above, along with Relator and his technicians.  WSU also inflated the grant direct costs by inflating the equipment costs including, but not limited to, surgical supplies, MRI costs, and Animal Costs.

66.     All of these inflated direct costs led to inflated indirect costs as well, thereby increasing the amounts requested and paid in the grants by approximately 52%.

67.     Relator believes these fraudulent schemes to be a system wide problem at WSU.

68.     Relator spoke with other researchers who also complained about personnel who performed no work on their grants being allowed to draw a salary from their grants.

69.     Relator was on a panel that found many of these abuses to be prevalent in WSU's research culture.  (**Exhibit H** – Report).

70.     To date, despite being aware of the problem in its research department culture and grant application process, WSU has done nothing to correct it.

71.     Indeed, when Relator complained about these issues and refused to comply with the fraudulent activity, he was retaliated against and wrongfully terminated. (**Exhibit I** – emails refusing to comply, and **Exhibit J** – termination documents).

## FIRST CAUSE OF ACTION

### False Claims Act: Presentation of False Claims

### 31 U.S.C. § 3729(a)(1)

72.     Plaintiff-Relator hereby incorporates, repeats and realleges each allegation stated above, as if fully set forth herein.

73.     Defendants, by and through their agents, offices, or employees, knowingly presented or caused to be presented false or fraudulent claims for payment or approval to the United States Government.

74      By virtue of the false or fraudulent claims submitted by Defendants, the United States has suffered damages and therefore is entitled to treble damages, civil penalties, and all other relief available under the False Claims Act, 31 U.S.C. §§ 3729, *et. seq.*

## SECOND CAUSE OF ACTION

### False Claims Act:  Making or Using a False Record or Statement

### 31 U.S.C. § 3729(a)(2)

75.     Plaintiff-Relator hereby incorporates, repeats and realleges each allegation stated above, as if fully set forth herein.

76.     Defendants, by or through their agents, officers or employees, knowingly made, used, or caused to be made or used, false records or statements in order to get false or fraudulent claims paid or approved by the United States Government.

77.     By virtue of the false records or statements made by Defendants, the United States has suffered damages and therefore is entitled to treble damages, civil penalties, and other relief available under the False Claims Act, 31 U.S.C. §§ 3729, *et seq.*

### THIRD CAUSE OF ACTION

**False Claims Act:  Conspiracy to Defraud**

**31 U.S.C. § 3729(a)(3)**

78.     Plaintiff-Relator hereby incorporates, repeats and realleges each allegation stated above, as if fully set forth herein.

79.     Defendants, by or through their agents, officers or employees, knowingly made, used, or caused to be made or used, false records or statements in order to get false or fraudulent claims paid or approved by the United States Government.

80.     Defendants, by or through their agents, officers or employees, illegally, unlawfully, maliciously, and wrongfully conspired with one another with the intent to, and for the illegal or unlawful purpose of defrauding the federal government of funds for scientific grants and research,

81.     Defendants in combination conspired with one another with the intent to and for the illegal or unlawful purpose of defrauding the federal government, as outlined above, by express or implied agreement.

82.     This conspiracy resulted in the illegal, unlawful, or tortious activity of the federal government being deliberately overcharged for these grants, and the loss of these funds.

83.     By virtue of the conspiracy and production of false records or statements made by Defendants, the United States has suffered damages and therefore is entitled to treble damages, civil penalties, and other relief available under the False Claims Act, 31 U.S.C. §§ 3729, *et seq.*

## FOURTH CAUSE OF ACTION

### False Claims Act:  Reverse False Claims Act Claim

### 31 U.S.C. § 3729(a)(7)

84.     Plaintiff-Relator hereby incorporates, repeats and realleges each allegation stated above, as if fully set forth herein.

85.     Defendants, by or through their agents, officers or employees, knowingly made, used, or caused to be made or used, false records or statements in order to get false or fraudulent claims paid or approved by the United States Government.

86.     As shown above, Defendants were successful in fraudulently procuring the funds.

87.     Defendants were aware that they had received overpayments from the federal government.

88.     Defendants were aware that they were required to return any overpayments to the federal government.

89.     Defendants failed, and/or refused, to return the funds to the federal government.

90.     The "reverse false claims act" claim was recognized in *US v. Pemco Aeroplex*, 195 f3d 1234 (11th CA 1999).

91.     By virtue of Defendants failure to return the overpayments, the United States has suffered damages and therefore is entitled to treble damages, civil penalties, and other relief available under the False Claims Act, 31 U.S.C. §§ 3729, *et seq.*

## FIFTH CAUSE OF ACTION

### False Claims Act:  Retaliation

### 31 U.S.C. § 3729(h)

92.     Plaintiff-Relator hereby incorporates, repeats and realleges each allegation stated above, as if fully set forth herein.

93.     As shown above, Plaintiff-Relator complained, internally, about the inflationary grant writing policies and practices at WSU, brought the practice to his supervisor's attention, and refused to participate in the illegal activity and scheme to defraud the government. **(Exhibits I and M)**.

94.     As a result of Plaintiff-Relator's complaints he was targeted by the administration of WSU, even though WSU knew Plaintiff-Relator's complaints were protected activity.

95.     Defendants engaged in a deliberate course of conduct aimed at defaming Plaintiff-Relator with the express purpose of terminating him.

96.     Defendants wrongfully terminated Plaintiff-Relator in 2012, based on falsified data and without giving him his due process rights.[6]

97.     Plaintiff-Relator is currently engaged in an administrative hearing/claim which his union has joined, against WSU for his wrongful termination.

98.     By virtue of Defendants wrongful termination and retaliation against Plaintiff-Relator, the United States, through Plaintiff-Relator, has suffered damages and therefore is entitled to treble damages, civil penalties, and other relief available under the False Claims Act, 31 U.S.C. §§ 3729, *et seq.*

### FIFTH CAUSE OF ACTION

#### State Claim:

#### Retaliatory Discharge in Violation of Public Policy

---

[6] Defednant WSU also terminated Relator's entire staff, and also expelled them from their Ph.D track programs, thereby destroying the staff's futures as well.  This is despite there being no evidence the staff engaged in any wrong doing. **(Exhibit M** – Affidavit of Kreipke).

99.     Plaintiff-Relator hereby incorporates, repeats and realleges each allegation stated above, as if fully set forth herein.

100.    As shown above, Defendants, through their agents, servants, or employees, violated the False Claims Act and other applicable federal law.

101.    Relator refused to break applicable laws referenced above or violate the False Claims Act, when demanded of him by his superiors. (**Exhibits I and M**).

102.    Defendant WSU discharged the Relator in whole or in part for refusing to break the law, including the False Claims Act.

103.    As a direct and proximate result of Relator's refusal to violate the law, , and as a result of Defendant's retaliatory discharge of Plaintiff, Plaintiff has been placed in financial distress, has suffered loss of wages and benefits, loss of earning capacity, loss of the ability to work, and will suffer these losses in the future.

104.    As a direct and proximate result of Defendant's violations stated above, Plaintiff has suffered depression, emotional and physical distress, mental and physical anguish, humiliation, loss of reputation and embarrassment, and will suffer these problems in the future.

**VIII.  PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff-Relator respectfully requests this Court to enter judgment against Defendant as follows:

(a)     That the United States be awarded treble the amount of damages sustained because Defendants fraudulent activity and submission of false claims;

(b)     That civil penalties of $11,000 be imposed for each and every false claim presented by Defendants.

(c)     That pre-and post judgment interest be awarded;

21

(d)     That reasonable attorneys fees, costs and expenses, which the Plaintiff-Relator necessarily incurred in bringing the action, be awarded.

(e)     That the Court grant permanent injunctive relief to prevent any recurrence of the False Claims Act violations alleged herein.

(f)     That the Plaintiff-Relator be awarded between 15 and 25 percent of the recovery to the United States if the United States intervenes in the action or between 25 and 30 percent of the recover if the United States declines to intervene as provided by the False Claims Act; and

(g)     That the Court award such other relief as it may deem just and proper.

Respectfully submitted,

AKEEL & VALENTINE, PLC

__s/: Shereef Akeel_____
Shereef H. Akeel, Esq. P54345
S. Hussain Akbar P67967
Attorneys for Plaintiff
888 West Big Beaver Road, Suite 910
Troy, MI  48084-4736
Telephone: (248) 269-9595
Facsimile: (248) 269-9119

DATED:      October 31, 2012

## DEMAND FOR JURY TRIAL

NOW COMES Relator by and through his undersigned counsel, Akeel & Valentine, PLC, and hereby demands a trial by jury for the above-referenced cause of action.

Respectfully submitted,

AKEEL & VALENTINE, PLC

__s/: Shereef Akeel_____

22

Shereef H. Akeel, Esq. P54345
S. Hussain Akbar P67967
Attorneys for Plaintiff
888 West Big Beaver Road, Suite 910
Troy, MI 48084-4736
Telephone: (248) 269-9595
Facsimile: (248) 269-9119

DATED:        October 31, 2012

Z:\Myfiles\G_L\Kreipke, Chris\Pleadings-draft\Complaint draft4.0.doc