IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MICHIGAN
Southern Division

UNITED STATES OF AMERICA
*ex rel,* Dr. Christian Kreipke, also, individually
as to his individual claims.

                    Plaintiff,                      Civil Action No. 12-14836

BRINGING THIS ACTION ON BEHALF OF
THE UNITED STATES OF AMERICA

v.                                              Hon. Avern Cohn

                                              Qui Tam Action

WAYNE STATE UNIVERSITY,  and
UNIVERSITY PHYSICIAN GROUP,

                    Defendants.

---

## FIRST AMENDED COMPLAINT

Plaintiff-Relator Dr. Christian Kreipke, on behalf of himself and the United States of America, alleges as follows:

## I.       NATURE OF ACTION

1.       Dr. Christian Kreipke (hereinafter "Dr. Kreipke"), Plaintiff and Relator, brings this action pursuant to the *qui tam* provisions of the "False Claims Act," 31 U.S.C. §§ 3729, *et seq.* to recover treble damages, civil penalties and all other relief available under the Act.

2.       This case involves an egregious, and systemic, scheme involving false claims presented for payment, and false documents submitted in order to get claims paid.  As more fully described below, these claims were submitted to the United States Government by either, or both, Defendants and are related to their grossly inflated research grant proposals.  Defendants profited from this abusive scheme by 1) inappropriately "drawing down" grants by personnel not working on the grant (herein referred to as "Ghost Employees"; 2) rapidly "drawing down" grants on non-personnel items; 3) providing false Effort Reporting (percentage of a time personnel is supposed to work on a proposed research project) representations; 4)  artificially inflating salaries or ignoring government mandated salary caps, 5)  artificially inflating supplies costs (e.g., grossly inflating costs associated with purchasing laboratory rats) 6) double billing for clinical costs (e.g., MRI and other related costs) by charging Medicare and Medicaid when the physician and the research costs were already fully funded by the United States Government by other federal grants; and 7) providing false claims related to indirect cost funding provided by the United States Government.

3.       As a result of Defendants' false statements, false or fraudulent claims, and false submissions, Defendants' wrongfully obtained hundreds of millions of dollars from the United States Government that they were not entitled to receive.

## II.     JURISDICTION

4.      This action arises under the False Claims Act, 31 U.S.C. §§ 3729, *et seq.*  This Court has subject matter jurisdiction over this action pursuant to 31 U.S.C. § 3732(a).  This court also has jurisdiction pursuant to 28 U.S.C. § 1345 and 28 U.S.C. § 1331.

5.      This court may exercise personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) because Defendants reside and transact business in the Eastern District of Michigan.  Additionally, the Defendants committed acts in violation of 31 U.S.C. § 3729 within the judicial district which is the Eastern District of Michigan (the "District").

## III.     VENUE

6.      Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) because the acts proscribed by 31 U.S.C. § 3732(a) et seq. and complained of herein took place within this District.  Additionally, venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and (c), because at all times material and relevant, Defendants transacted business in this District.

## IV.     PARTIES

7.      Relator, Dr. Christian Kreipke, is a citizen of the United States and a resident of the State of Michigan.  Relator was an employee of Wayne State University ("WSU").  During his term of employment, Relator was, also, appointed to a committee responsible for essentially auditing and investigating research grant procurement by WSU as back as 2006.  Relator has, also, been a frequent guest of the United States Government (e.g. NIH, DOD) invited to review grants submitted by other universities for federal grant funding.  Relator brings this action based on his direct, independent, and personal knowledge and also upon information and belief based on facts known to him.

8.      Relator is an "original source" of the information alleged herein as that term is used in the False Claims Act context.  He has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the United States Government before filing an action under the False Claims Act.

9.      Dr. Kreipke is a Ph.D., who was on a tenure-track at the WSU School of Medicine.  In 2010, Relator was also selected by the Provost of WSU, Ronald T. Brown, to serve on a committee that essentially served as an audit and investigation committee.  Relator was wrongfully terminated from WSU in 2012 after reporting his concerns among other matters that the manner WSU was requesting grants was at odds which federal policy.

10.     Dr. Kreipke has over 40 publications in the area of Cellular and Clinical Neurobiology. He currently has or has had grants from the National Institutes of Health ("NIH"), Department of Veterans Administration ("VA"), and others.  Further, Dr. Kreipke is on dozens of regional and national professional societies and has won numerous awards in his discipline.  (**Ex. A – CV Dr. Kreipke**).

11.     Defendant University Physician Group ("UPG"), is a domestic non-profit corporation that in part attends to the billing for Defendant Wayne State University's Hospitals.  UPG is a 2,000 plus closed group physician practice serving WSU.  UPG also operates clinics and see patients.  Dr. Kreipke's research directly benefits patients in the Rehabilitation clinic at UPG.

12.     Defendant WSU is a State funded university that was founded in 1868; WSU consists of 13 schools and colleges offering more than 400 major subject areas to over 32,000 graduate and undergraduate students. It is currently the third largest university in the State of Michigan and one of the 30 largest universities in the United States. The WSU School of Medicine is ranked 62nd nationally in receipt of NIH funds for the year 2011.  As of December 2011, WSU had over

$53,500,000 in NIH grants and contracts for that year alone.  And, in 2012 WSU received a total of nearly $120,000,000 million for just direct costs (defined below) from the United States Government (which includes NIH grants) in research funding (http://fisops.wayne.edu/avp/wsufr2012.pdf).

### V.    THE FALSE CLAIMS ACT

13.    The False Claims Act ("FCA") provides in pertinent part that:

> (a)   Any person who (1) knowingly presents, or causes to be presented to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval; (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government (3) conspires to defraud the Government by getting a false or fraudulent claim paid or approved by the Government, ...or (7) knowingly makes, uses or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government.
> * * *
> is liable to the United States Government for a civil penalty of not less than $5,500 and not more than $11,000, plus 3 times the amount of damages which the Government sustains because of the act of that person. . .
> (b)   For purposes of this section, the terms "knowing" and "knowingly" mean that a person, with respect to information (1) had actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required.

31 U.S.C. § 3729

### VI.    DEFENDANTS' FRAUDULENT SCHEMES

14.    **Inflated costs associated with and Rapid Draw-Down of Grants**:  The amount of money that the University receives from the United States Government per grant is dictated, in part, by initial budget requests prepared by the University officials.  Furthermore, the rate at

5

which grants may be drawn down is governed by guidelines issued by the Department of Education, the NIH, and other federal granting agencies.

15.    At WSU, Relator witnessed first-hand that the University was both inflating material costs associated with grants[1] and rapidly drawing down his grants and other grants by increasing the percent of effort that personnel were spending on the grants in order to draw down the salary amounts and indirect costs at a much greater rate than budgeted.

16.    Because of this scheme, and as described below, the budgets and many of the effort reports that were, and are, submitted to the various federal agencies are false and fraudulent.

17.    Additionally, grant applications require the applicant to identify all key personnel that will perform work on the grant and to budget a salary for those personnel.

18.    In order to cover budget shortfalls in other areas, Defendant WSU allowed Ghost Employees to draw salaries from grants on which they were not working.

19.    Additionally, WSU artificially inflated researchers' salaries in its grant applications, to increase the total funds procured from the United States Government.

20.    Furthermore, WSU disregarded government-mandated salary caps that are imposed on grants, thus causing the United States Government to overpay individual researcher salaries.

21.    The aforementioned schemes caused, 1) higher payments from the United State Government for individual grants 2) the grants to be drawn down faster than budgeted and 3) the submission of false claims for payments related to a) Ghost Employee (s) (or employee (s) that really did not work on the grant but their name (s) were listed), and b) inflated personnel salaries.

---

[1] For example, in **Ex. K**, pg. 5, there is a request for $205,000 for rats.  In the same **Ex. K**, pg. 72, the total number of rats used is 396.  This means that WSU was requesting $517 per rat per year, where the published rate of rat costs is ~$35 (**Ex. Q**).  This represents a more than 14-fold inflation in price.  Similarly, in **Ex. C**, a budget request was made for $26,201 for animal care for one year of a grant, **Ex. B**.  In that year only 200 animals were used (**Ex. B**, pg. 71).  At $1 per diem cost (**Ex. N**, pg. 48), this amounts to $200 in total animal care.  Thus animal care costs were inflated by $26,001, per year.  Thus, a single rat, according to this scheme, would cost over $4,000 for the animal plus animal care costs, versus actual cost of ~$36 for the animal plus animal care costs.

22.    **Fraudulent Effort Reporting:**    The representatives of the Sponsored Programs Administration ("SPA") acting under the direction of the Office of the Vice President of Research ("OVPR") at WSU have signing authority for the principal investigators ("PI"). Pursuant to this signing authority, SPA submitted effort reports with percent effort numbers changed from what was budgeted, and then signed off for the principal investigator.  Relator discovered that WSU reported higher effort for researchers on his grant than actually committed, causing the United States Government to reimburse WSU a higher percentage of their overall salaries.

23.    Overlap (whether scientific, budgetary, or commitment) of an individual's effort greater than 100%, is not permitted[2].  The goals in identifying and eliminating overlap are:  1) to ensure that sufficient and appropriate levels are committed to a certain project - that there is no duplication of funding for scientific aims, specific budgetary items, or an individual's level of effort; and, 2) only funds necessary to the conduct of the approved project are included in the award.[3]

24.     "Budgetary Overlap" occurs when duplicate or equivalent budgetary items (e.g. equipment salary) are requested in an application but are already provided by another source.

25.     "Commitment Overlap" occurs when a person's time commitment exceeds 100%, whether or not salary support is requested in the application.  While information on other support for salary is only requested for personnel (excluding consultants), no individual on the project may have commitments in excess of 100%.

26.    When submitting grant application information to the United States Government, WSU researchers, including Relator, were required by WSU to omit their clinical, teaching and service

---

[2] http://www.niaid.nih.gov/researchfunding/qa/pages/salary.aspx#high
[3] As will be shown below one individual, was committed at 100% effort on two separate grants.  This is clearly fraudulent as nobody can be giving 100% of their work time to two separate grants.

salary and the percent effort they spend performing their clinical, teaching and service duties from the application materials and the subsequent effort reporting materials.[4]

27.     The omission, and inaccuracy, of the effort reported causes the grant application and/or its supporting materials, to be inflated.  This also causes the effort reports actually submitted by WSU to be false claims for payments.

28.     This clinical, teaching and service data was omitted from all of the Relator's grant applications and effort reports on Federal grants.  The omission of this data is system-wide at WSU, as mandated or implemented as a policy, making many if not most of the grant applications where the researcher omits clinical or teaching salary effort from the application or effort report, false claims for payment.

29.     Relator earned approximately two-thirds of his income from "teaching and service" drawn from "General Fund" as appropriated by the State of Michigan.  Yet, nowhere on his effort reports is any time effort or budget effort reported to the United State Government related to mandated other duties like "teaching and service."

30.     Moreover, WSU takes the affirmative position in the policies and procedures it provides to its employees that they are not required to report their teaching, service, or UPG time and income when effort reporting.

31.     Thus, there is no doubt that this fraud is systemic at WSU and UPG.

32.     The United States Government is thereby defrauded of millions of dollars through this system wide conduct.

---

[4] This is clearly evidenced by the failure of Defendant WSU to include teaching time into the equation when computing a researcher's time.  As stated above, the State of Michigan requires that 40% of a tenure track professor's time be devoted to teaching.  (**Ex. P**, p.5).  Yet, Relator's individual contract required that he spend 50% of his time teaching.  (**Ex. O** – Dr. Kreipke Contract).  However, Defendant WSU submitted grants requesting funds for Relator in excess of his remaining work time.  (**Ex.s J-N**).  It must be noted that the State of Michigan requires 40% dedication to teaching because it is providing funds for these researchers' salaries.

33.    **Inappropriate Medicare Billing for Clinical Costs When the Research Costs Were Already Paid for by Federal Grants**:  When an individual clinical researcher reports effort on United States Government grants involving human research subjects, he or she is ineligible to bill Medicare for any overlapping work done on those research subjects (http://www.ncbi.nlm.nih.gov/pmc/articles/PMC2793665/).  This is because the United States Government is already paying for the research (e.g. the researcher's salary, MRI time, etc.) through the grant, and the researcher should not request additional funding/reimbursement for the research work.

34.    Upon information and belief, Defendant UPG submitted bills to Medicare claiming them as services rendered by Relator's research (e.g. MRI costs) and other researchers' salaries.  This is despite the fact that Relator's grants did not involve human subjects.

35.    This necessarily led to the overpayment of clinical costs, including but not limited to salary and research-related costs.

36.    This also necessarily led to the overpayments of clinical costs based on multiple sources of reimbursement (e.g. NIH grants and Medicare).

37.    The net result of these schemes was that the United States Government was double-billed and fraudulently forced to overpay these individual researchers, and research costs, from federal funds.

38.    Thus, many of the Medicare billings by Defendants under the researchers on these grants are false claims for overpayment.

39.    Relator, upon information and belief, asserts this is a systemic problem at WSU and UPG.

40.     **<u>False Claims for Indirect Costs and Fringe Benefits</u>**:  Direct Costs are any costs that can be easily identified with a specific project (grant/contract), e.g. salaries, wages, materials, supplies, subcontracts and consultants.

41.     Indirect Costs are any costs that are not easily identified (or it would not be cost effective to identify) to a specific project.

42.     There are two types of indirect costs: 1) Overhead and 2) General and Administrative ("G&A").

43.     Overhead is comprised of indirect costs associates with the performance of a project, e.g. facilities costs (rent, heat, electricity, etc.), general laboratory supplies, etc.

44.     "G&A" is defined as indirect costs associated with the overall management of an organization, e.g. President's office, Human Resources Office, Accounting Office, office supplies, etc.   The terms "G&A" "F&A" rate (facilities and administrative rate) is a term synonymous with the indirect cost rate.

45.     Fringe Benefits are services or benefits provided to employees, e.g. health insurance, payroll taxes, pension contribution, paid absences, etc.

46.     With regard to federal grants, Direct (DC), Indirect (IC) costs, and Fringe Benefits (FB) are distinct and separately funding categories.

47.     The IC rate charged by WSU in its grant applications, and reimbursed by the United States Government, was approximately 52% (see **Ex. B**, pg. 38).

48.     The FB rate charged by WSU in its grant application, and reimbursed by the United States Government, was approximately 25.8% (see **Ex. C**).

49.     WSU's policy is to maximize IC and FB reimbursement.

50.     Therefore, for every ($1.00) dollar in fraudulently inflated DC, WSU receives an additional fifty-two cents ($0.52) for IC, and twenty-five point eight cents ($0.258) for FB.

51.     Federal granting agency regulations prohibit dispersing IC for the purchase of equipment (https://grants.nih.gov/grants/developing_budget.htm#difference).   For example, if there is a $250,000 modular grant request (see **Ex. B** for an example of a modular request), and equipment valued at $50,000 is properly disclosed in the request, the federal government would pay IC on only $200,000 ($250,000 less $50,000 in equipment).

52.     If such an equipment request was made, in a grant, under DC and approved by the Federal granting agency, it is understood that these requests are made without any accompanying request for Indirect Costs.  Again, this is because WSU would not receive an additional fifty-two cents for any funds related to equipment.

53.     Relator was instructed to refrain from including large and very sophisticated equipment, in his grant requests under DC when submitting grants.

54.     During the life of many WSU grants, the equipment would be purchased after the initial budget (which did not include the equipment cost) was approved by the granting agency. However, after the initial budget is approved and funds distributed, WSU would then internally approve the equipment purchase without reporting it to the United States Government.  Since IC would already have been disbursed, WSU had an obligation to refund (but did not do so) to the United States Government for IC wrongfully paid for equipment purchases. (https://grants.nih.gov/grants/developing_budget.htm#difference).

55.     Indeed, an example where WSU would purchase equipment without obtaining approval from the federal government that further support Plaintiff-Relator's claims can be found in a recent report by the Office of Inspector General for the Department of Health and Human

Services which found that WSU had "claimed federal reimbursement for an item of equipment" that was purchased "without prior approval from the awarding agency."  (**Ex. AA** – DHHS OIG Equipment Report dated February 2013, pg.i).

56.     In certain instances in grants where the equipment was purchased after initial budget was furnished, WSU would charge the individual PI for these costs, alleging that the equipment was "disallowable" when in fact it was previously approved by WSU but never reported to NIH as a DC item.

57.     Through this method, WSU would receive funds for the equipment in three different manners; 1) from the United States Government based on the total DC budgeted (e.g. 250,000 per module without identifying the equipment, because had the equipment been identified, WSU would have instead received less IC related to the equipment), 2) the additional IC provided on equipment that should not have IC associated with it, and 3) after charging the individual PI for alleged "disallowable" costs.

58.     The misappropriation of IC occurs across the board at WSU.

59.     In 2011, and possibly other years, Relator believes that Defendants received millions in IC grant funding using such scheme from the United States Government.

## VII.     FRAUD IN AN EXEMPLARY GRANT WHERE RELATOR WAS PI AND KNOWN MONEY WAS DISBURSED BY THE UNITED STATES

60.     In order to show Relator's direct evidence of the above alleged fraud, Relator will provide information from a specific grant on which he was the PI.

61.     Relator was the **principal investigator** on **Ex. B**.

62.     Individual examples of fraud or fraudulent attempts are as follows, and total nearly $400,000 on just one grant and a suspected total fraud of over **$169,000,000** over seven years of

total NIH funding to WSU[5].  This assumes that WSU implemented the same fraudulent schemes described above regarding other grants as observed by the Relator when serving as an auditor and reviewing a sample of grants spanning a period of 7 years.

Grant Number R01NS064976-01 A2. (**Ex. B**)

| Grant Number/short title | Agency | Examples of Direct (d) Cost Fraud | Examples of Indirect (i) Cost Fraud | Amount of Suspected Fraud |
|---|---|---|---|---|
| R01NS064976-01 A2 | NIH | Initial request for 60% effort for Dr. Kreipke (60% effort violates contract in which only 40-45% effort may be devoted to research) (**Ex. C**).  Actual payment for initial period was 70% effort (**Ex. D**). | Indirects and fringes calculated on inflated effort | **~$20,000** |
| | | Initial request for inflated base salary ($136,000 as opposed to actual salary $115,000) (**Ex. C**) which necessarily increased actual funds given to University. | Indirects and fringes calculated on inflated base salary | **~$45,000** |
| | | After two months Dr. Kreipke was reduced to 45% effort to account for teaching and service duties, however was artificially inflated to 50% effort on or around 9/1/2010 with no justification for a 5% increase in effort and salary recovery (**Ex. E**). | Indirects and fringes calculated on additional 5% effort and salary | **~$13,500** |
| | | Grossly inflated salary for Christian Reynolds ($41,000 versus published GRA/"Pre-Doc" salary of ~$22,000; See **Ex. Q**, p.2 for actual published "Pre-Doc" salary and compare to salary given to Reynolds. (**Ex. F**).  WSU continued to charge Mr. Reynolds' salary to the grant even after he was removed from it. | Indirects and fringes calculated on inflated salary, tuition, and continued salary after leaving lab | **~$60,000** |

---

[5] **_TOTAL AMOUNT OF SUSPECTED FRAUD (Limited to NIH grants)_**

According to NIH Reporter, WSU obtained grants and contracts from NIH exceeding 1.5 billion dollars over the last 7 years..  Based on the average suspected fraud per grant over the examples provided above ($488,442) X the number of grants received from WSU over a seven-year period from NIH (923; based on published information on the number of WSU NIH grants (http://projectreporter.nih.gov/reporter.cfm)), alone, a conservative estimate of total fraud far exceeds 150 million dollars which still does represent a small percentage of the total funding obtained from NIH, which is in excess of 1.5 billion dollars.

| | | | | |
|---|---|---|---|---|
| See **Ex. B** for documents related to this grant. | | Inclusion of Donald Kuhn (1.8 cal. Months, approx. 15% effort) at actual salary ($241,870) as opposed to NIH salary cap ($199,700) **(Ex. G)**. | Indirects and fringes calculated on actual salary as opposed to salary cap | **~$21,000** |
| | | Inclusion of  a Ghost Employee, Catherine Robinet who did not work with Relator on Relator's own grant, **(Ex. H)**. | Indirects and fringes calculated on salary of Ghost Employee | **~$16,000** |
| | | Grossly inflated animal care costs ($26,201 calculated into final $250,000 module where only ~$2,000 required) **(Ex. C)**. | Indirects calculated on inflated animal care costs | **~$110,000** |
| | | Misc MRI costs totaling $23,400 encumbered to grant but work was never completed **(Ex. I)**. | Indirects calculated on erroneous MRI charges | **$35,568** |

*=~$321,068 in actual fraud + additional $75,000 had grant run to completion (grant was prematurely terminated with two years remaining due to the termination of Dr. Kreipke*

## VIII.   FRAUD IN OTHER ACTUAL GRANT SUBMISSIONS TO THE UNITED STATES WHERE RELATOR WAS EITHER PI OR KEY PERSONNEL

a.   Grant Number U01NS072045-01 commonly referred to as "Clazosentan+TBI." **(Ex. J)**

| Grant Number/short title | Agency | Examples of Direct (d) Cost Fraud | Examples of Indirect (i) Cost Fraud | Amount of Suspected Fraud |
|---|---|---|---|---|
| U01NS072045-01/ Clazosentan+TBI | NIH | Inflated salary for PI (Dr. Kreipke); budgeted $155,000 base salary **(Ex. J**, p.5); actual $115,000 **(Ex. O)** | Indirects requested on inflated budget | $11,400 (d) + $5,928 (i) **=$17,328** |
| See **Ex. J** for documents related to this grant. | | Inclusion of Patrick Mueller ($11,170+indirects budgeted) | Indirects and fringes requested on Patrick Mueller | $11,170 (d) + $5,808 (i) **=$16,978** |
| | | Grossly inflated salaries for 3 technicians ($157,974+ indirects budgeted **(Ex. J**, p.5), actual should be $94,350+indirects **(Ex. J**, p.9 and **Ex. L**, p.2,3) | Indirects and fringes requested on grossly inflated salaries of technicians | $63,624 (d) + $33,084 (i) **=$96,708** |
| | | Grossly inflated surgical supplies ($75,000+indirects budgeted | Indirects requested on grossly inflated | $65,000 (d) + $33,800 (i) |

| | | (**Ex. J**, p.5), actual $10,000+ indirects (**Ex. J**, p.9 and **Ex. R**)[6] | surgical supplies | =**$98,800** |
|---|---|---|---|---|
| | | Grossly inflated animal costs ($167,700+indirects budgeted (**Ex. J**, p.5), actual $13,000+ indirects needed(**Ex. J**, p.9 and **Ex. Q**, p.1) | Indirects requested on grossly inflated animal costs | $154,700 (d) + $80,444 (i) =**$235,144** |
| | | Grossly inflated MRI costs (122,760+indirects budgeted (**Ex. J**, p.5), actual 51,480 needed (**Ex. J**, p.10) | Indirects requested on grossly inflated MRI costs | $71,280 (d) + $37,066 (i) =**$108,346** |

=***$573,304 total suspected fraud***

b.       Grant Number U01NS072045-01 **A1** commonly referred to as " Clazosentan+TBI." (**Ex. K**)

| Grant Number/short title | Agency | Examples of Direct (d) Cost Fraud | Examples of Indirect (i) Cost Fraud | Amount of Suspected Fraud |
|---|---|---|---|---|
| U01NS072045-01 A1/ Clazosentan+TBI | NIH | Inflated salary for PI (Dr. Kreipke); budgeted $157,668 base salary (**Ex. K**, p.5); actual $115,000 (**Ex. O**) | Indirects requested on inflated budget | $12,206 (d) + $6,347 (i) =**$18,553** |
| See **Ex. K** for documents related to this grant. | | Inclusion of Patrick Mueller ($12,002+indirects budged (**Ex. K**, p.5) when he did no work | Indirects and fringes requested on Patrick Mueller | 12,002 (d) + $6,241 (i) =**$18,243** |
| | | Grossly inflated salaries for 3 technicians ($183,150+indirects budgeted[7] (**Ex. K**, p.5), actual should be $94,350+ indirects (**Ex. K**, p.10 and **Ex. Q**, p.2,3) | Indirects and fringes requested on grossly inflated salaries of technicians | $88,800 (d) + $46,146 (i) =**$134,976** |
| | | Grossly inflated surgical supplies ($75,000+indirects budgeted (**Ex. K**, p.5), actual $10,000+ indirects (**Ex. K**, p.10 and **Ex. R**) | Indirects requested on grossly inflated surgical supplies | $65,000 (d) + $33,800 (i) =**$98,800** |
| | | Grossly inflated histological supplies($15,000+ indirects budgeted (**Ex. K**, p.5), actual $3,000+indirects (**Ex. K**, p.10) | Indirects requested on grossly inflated histological supplies | $12,000 (d) + $6,240 (i) =**$18,240** |
| | | Grossly inflated animal costs ($205,000+indirects budgeted (**Ex. K**, p.5, 72), actual $13,000+indirects needed (**Ex.** | Indirects requested on grossly inflated animal costs | $192,000 (d) + $99,840 (i) =**$291,840** |

---

[6] The determination of the actual rates that should have been submitted for items like surgical supplies, animal costs, and histological supplies is based on the published accepted rates that Defendant WSU actually provides to PIs/researchers.  (**Ex. Q** – WSU Published Rates).

[7] The difference between the technician salaries in (a) and (b) is an unexplained raise given to one technician (**Ex. J**, p.5) who had actually transferred to another lab, in a different department by the time this grant application had been submitted.

| | | | | |
|---|---|---|---|---|
| | | **K**, p.5 and **Ex. Q**, p.1) | | |
| | | Grossly inflated MRI costs (169,000+indirects budgeted (**Ex. K**, p5), actual 51,480 needed (**Ex. K**, p.10) | Indirects requested on grossly inflated MRI costs | $117,520 (d) + $61,110 (i) =**$178,630** |

**=$759,282 total suspected fraud**

    c.      Grant Number R01NS039860-09 A2/, commonly referred to as "Control + TBI." (**Ex. L**)

| Grant Number/short title | Agency | Examples of Direct (d) Cost Fraud | Examples of Indirect (i) Cost Fraud | Amount of Suspected Fraud |
|---|---|---|---|---|
| R01NS039860-09 A2/ Control + TBI<br><br>See **Ex. L** for documents related to this grant. | NIH | Inclusion of Donald Kuhn (1.8 cal. Months, approx. 15% effort) when he did no work, and was on multiple other grants.  (**Ex. L**, p.11, 12). | Indirects requested on maximum module allowed ($250,000/year) | **~$200,000** |
| ***NOTE:  Grant requested five (5) $250,000 modules while four (4) with less increment would suffice*** | | | Indirects calculated on total modules without regard for items not receiving indirects. (**Ex. D**, p.35). | **~$50,000** |
| | | Inclusion of Mark Haacke (consultant) (Note inclusion was mandated since he was Director of MRI facility even though Dr. Kreipke and his technicians were fully trained) (**Ex. L**, p.12). | Indirects requested on maximum module allowed (250,000/year | **~$50,000** |

**=$300,000 total suspected fraud**

    d.      Grant Number R01NS073603-01, commonly referred to as "Polypathology and TBI." (**Ex. M**)

| Grant Number/short title | Agency | Examples of Direct (d) Cost Fraud | Examples of Indirect (i) Cost Fraud | Amount of Suspected Fraud |
|---|---|---|---|---|
| R01NS073603-01/ Polypathology and TBI | NIH | Inclusion of Donald Kuhn (1.8 cal. Months, approx. 15% effort) when he did no work, and was on multiple other grants.  (**Ex M**, p.11). | Indirects requested on maximum module allowed ($250,000/year) | **~$150,000** |
| See **Ex. M** for documents related to this grant. | | Inclusion of Christian Reynolds (12 cal. Months) (already committed 100% effort on another grant) when he did no work. (**Ex. M**, p.36). | Indirects requested on maximum module allowed ($250,000/year) | **~$200,000** |

| | | | Indirects calculated correctly WITH full regard for costs which are not "indirect" generating (e.g. equipment) (**Ex. M**, p.33). | |
|---|---|---|---|---|
| *NOTE:  Grant requested five (5) $250,000 modules while four (4) with less increment would suffice* | | | | |
| | | Inclusion of Mark Haacke (consultant) (Note inclusion was mandated since he was Director of MRI facility even though Dr. Kreipke and his technicians were fully trained) (**Ex. M**, p.12). | Indirects requested on maximum module allowed (250,000/year | **~$50,000** |

*=$400,000 total suspected fraud*

    e.       Grant Number R01NS069937-01.  (**Ex. N**)

| Grant Number/short title | Agency | Examples of Direct (d) Cost Fraud | Examples of Indirect (i) Cost Fraud | Amount of Suspected Fraud |
|---|---|---|---|---|
| R01NS069937-01 | NIH | Grossly inflated material costs (budgeted $98,000+indirects for first year and $98,000+ indirect +3% inflation each subsequent year (**Ex. N**, p.33); actual needed ~$140,000 +indirects total (**Ex. R**) | Indirects requested on grossly inflated materials and supplies | $375,000 (d) + $195,000 (i) **=$570,000** |
| See **Ex. N** for documents related to this grant. | | Inclusion of ~$5,000 per year for equipment maintenance (should be an "indirect" cost and not calculated as a "direct" cost) (**Ex. N**, p.33). | Indirects calculated on ~25,000 for equipment maintenance | **$13,000** |

*=$583,000 total suspected fraud*

63.    As can be seen from the above tables and supporting documentation there are repeated occurrences of inclusion of Ghost Employees, or employees who did not work (or could not have worked) as was represented to the United States Government, like Catherine Robinet, Mark Haacke, and Donald Kuhn on certain grants.

64.    Upon information and belief, individuals such as Donald Kuhn and Christian Reynolds could not have worked the hours provided in the grant applications, and effort reports submitted

for reimbursement, on any of these grants, as 100% of their committable time was already allocated to other endeavors (e.g. other grants, teaching, clinical work, and service).

65.     Further, WSU inflated DC related to these grants by inflating the salaries of the individuals named above, along with Relator and his technicians.  WSU also inflated the grant DC by inflating the non-salary costs including, but not limited to, surgical supplies, MRI costs, and Animal Costs.

66.     All of these inflated DC led to inflated IC and FB as well, thereby increasing the amounts requested and paid in the grants by approximately 52% and 25.8% respectively.

67.     Relator believes these fraudulent schemes to be systemic at WSU.

68.     Relator interviewed other researchers as part of his investigation while serving on the internal audit/investigation committee (as an auditor) at WSU who also complained about inflated costs and rapid draw down of their grants.

69.     Relator, through his involvement on the internal audit/investigation committee found many of these abuses to be prevalent in WSU's research culture and at odds with federal policy. (**Ex. S** – Report).

70.     To date, despite being aware of the problem in its research department culture and grant application process, WSU has done nothing to correct it.

71.     This is despite the fact that many of Relator's complaints and findings were supported by an independent report commissioned by WSU by "Huron Education."  (**Ex. W** – the "Huron Report").

72.     The Huron Report, dated September 2012, found several risks including, but not limited to:

        a.     WSU charged "more than the total cost of providing the service/product (surplus)" to researchers;

        b.     WSU's billing rates were "not based on actual cost;"

        c.     WSU "did not bill all users[researchers] consistently." (**Ex. W**, p.22)

73.    These findings relate and/or support the concerns to those which Plaintiff-Relator had complained of.

74.    Further, the Huron Report made recommendations including, but not limited to "Require that all core research facilities on campus that charge user fees follow applicable federal regulations and university policy, including in the development and use of their rates." (**Ex. W**, p.6).

75.    Finally, the Huron Report also stated that the authors had received complaints from the faculty, which had complained about the confusing and conflicting messages received on sponsored research.

76.    Specifically, just as complained about by Plaintiff-Relator, that a tenure-track faculty member hired to do full time research was also required to do four days a week of work in the clinic. (**Ex. W**, p.30).

77.    The Huron Report recommended that WSU "clearly define research expectations for current and new faculty members …". (**Ex. W**, p.30).

78.    One of the WSU grants noted above was also audited by NIH. (**Ex. X**.)

79.    The NIH auditors of the federal government stated that a "review was performed because (prior) Audits of National Institutes of Health (NIH) and other HHS grantees have found internal control deficiencies, problems with financial stability, inadequate organizational structures, inadequate procurement and property management policies, and inadequate personnel policies and procedures. (**Ex. X**, p.12, 18).

80.    Again, these findings by the federal government regarding WSU, relate and/or support the complaints raised by Plaintiff-Relator.

81.	When Relator complained about these issues, including refusing to sign off on reports he believed were fraudulent, he was retaliated against and wrongfully terminated.  (**Ex. T** – emails refusing to comply, and **Ex. U** – termination documents).

82.	Plaintiff-Relator appealed his termination through arbitration which was denied.

83.	However, apparently the arbitrator and WSU failed to disclose the significant financial interest ties the arbitrator had with WSU; including the extent of his compensation and faculty status.

84.	Additionally, Plaintiff-Relator discovered that WSU's attorney had disclosed information to the appeal arbitrator that was not publically available, and should not have been put before him suggesting further retaliatory conduct by WSU to taint the arbitration process to see to it that Plaintiff is terminated.

85.	Indeed, on December 9, 2013, a panel of three (3) independent arbitrators found that the information supplied "was not yet available as part of the public record and was not made available to Dr. Kreipke" and that this information "had an influence" on the decision.  (**Ex. V** – NAA Decision dated December 9, 2013).

86.	The opinion further stated that "In our opinion, the integrity of the process requires that the matter be remanded with a direction that the Chair of the CPRG appoint a different H.O. to conduct a de novo hearing."  (**Ex. V).**

87.	On March 17, 2014, the Complaint on this instant action was unsealed and made available for the first time to the public.  (Doc. 18).

88.	On April 27, 204, the President of Defendant issued a commentary that was published in the Detroit Free Press which amounted to further retaliation against Relator by disparaging Plaintiff and further tarnishing his once stellar career.  (**Ex. Y**).

89.     Relator issued to Defendant a demand to retract the disparaging statements. (**Ex. Z**).

90.     No retraction was issued by WSU.

91.     As a result of the retaliation and wrongful termination, Relator has suffered severe economic and noneconomic damages, including but not limited to, loss of salary and benefits, damage to reputation and career, loss of standing in the community, in addition to extreme mental and emotional distress, depression, anxiety, and sleepless nights.

## FIRST CAUSE OF ACTION
### False Claims Act: Presentation of False Claims
### 31 U.S.C. § 3729(a)(1)

92.     Plaintiff-Relator hereby incorporates, repeats and realleges each allegation stated above, as if fully set forth herein.

93.     Defendants, by and through their agents, offices, or employees, knowingly presented or caused to be presented false or fraudulent claims for payment or approval to the United States Government.

94.     By virtue of the false or fraudulent claims submitted by Defendants, the United States has suffered damages and therefore is entitled to treble damages, civil penalties, and all other relief available under the False Claims Act, 31 U.S.C. §§ 3729, *et. seq.*

95.      As a result of the retaliation and wrongful termination, Relator has, also, suffered severe economic and noneconomic damages, including but not limited to, loss of salary and benefits, damage to reputation and career, loss of standing in the community, in addition to extreme mental and emotional distress, depression, anxiety, and sleepless nights

## SECOND CAUSE OF ACTION
### False Claims Act:  Making or Using a False Record or Statement
### 31 U.S.C. § 3729(a)(2)

96.     Plaintiff-Relator hereby incorporates, repeats and realleges each allegation stated above, as if fully set forth herein.

97.     Defendants, by or through their agents, officers or employees, knowingly made, used, or caused to be made or used, false records or statements in order to get false or fraudulent claims paid or approved by the United States Government.

98.     By virtue of the false records or statements made by Defendants, the United States has suffered damages and therefore is entitled to treble damages, civil penalties, and other relief available under the False Claims Act, 31 U.S.C. §§ 3729, *et seq.*

99.     As a result of the retaliation and wrongful termination, Relator has, also, suffered severe economic and noneconomic damages, including but not limited to, loss of salary and benefits, damage to reputation and career, loss of standing in the community, in addition to extreme mental and emotional distress, depression, anxiety, and sleepless nights.

## THIRD CAUSE OF ACTION
### False Claims Act:  Conspiracy to Defraud
### 31 U.S.C. § 3729(a)(3)

100.    Plaintiff-Relator hereby incorporates, repeats and realleges each allegation stated above, as if fully set forth herein.

101.    Defendants, by or through their agents, officers or employees, knowingly made, used, or caused to be made or used, false records or statements in order to get false or fraudulent claims paid or approved by the United States Government.

102.   Defendants, by or through their agents, officers or employees, illegally, unlawfully, maliciously, and wrongfully conspired with one another with the intent to, and for the illegal or unlawful purpose of defrauding the United States Government of funds for scientific grants and research,

103.   Defendants in combination conspired with one another with the intent to and for the illegal or unlawful purpose of defrauding the United States Government, as outlined above, by express or implied agreement.

104.   This conspiracy resulted in the illegal, unlawful, or tortious activity of the United States Government being deliberately overcharged for these grants, and the loss of these funds.

105.   By virtue of the conspiracy and production of false records or statements made by Defendants, the United States has suffered damages and therefore is entitled to treble damages, civil penalties, and other relief available under the False Claims Act, 31 U.S.C. §§ 3729, *et seq.*

106.   As a result of the retaliation and wrongful termination, Relator has, also, suffered severe economic and noneconomic damages, including but not limited to, loss of salary and benefits, damage to reputation and career, loss of standing in the community, in addition to extreme mental and emotional distress, depression, anxiety, and sleepless nights

## FOURTH CAUSE OF ACTION
### False Claims Act:  Reverse False Claims Act Claim
### 31 U.S.C. § 3729(a)(7)

107.   Plaintiff-Relator hereby incorporates, repeats and realleges each allegation stated above, as if fully set forth herein.

108.   Defendants, by or through their agents, officers or employees, knowingly made, used, or caused to be made or used, false records or statements in order to get false or fraudulent claims paid or approved by the United States Government.

109.    As shown above, Defendants were successful in fraudulently procuring the funds.

110.    Defendants were aware that they had received overpayments from the United States Government.

111.    Defendants were aware that they were required to return any overpayments to the United States Government.

112.    Defendants failed, and/or refused, to return the funds to the United States Government.

113.    The "reverse false claims act" claim was recognized in *US v. Pemco Aeroplex*, 195 f.3d. 1234 (11th CA 1999).

114.    By virtue of Defendants failure to return the overpayments, the United States has suffered damages and therefore is entitled to treble damages, civil penalties, and other relief available under the False Claims Act, 31 U.S.C. §§ 3729, *et seq.*

115.     As a result of the retaliation and wrongful termination, Relator has, also, suffered severe economic and noneconomic damages, including but not limited to, loss of salary and benefits, damage to reputation and career, loss of standing in the community, in addition to extreme mental and emotional distress, depression, anxiety, and sleepless nights.

**FIFTH CAUSE OF ACTION**
**False Claims Act:  Retaliation**
**31 U.S.C. § 3729(h)**

116.    Plaintiff-Relator hereby incorporates, repeats and realleges each allegation stated above, as if fully set forth herein.

117.    As shown above, Plaintiff-Relator complained, internally, about the inflationary grant writing policies and practices at WSU, brought the practice to his supervisor's attention, and refused to participate in the illegal activity and scheme to defraud the United States Government. (**Ex.s T and R**).

118.    As a result of Plaintiff-Relator's complaints he was targeted by the administration of WSU, even though WSU knew Plaintiff-Relator's complaints were protected activity.

119.    Defendants engaged in a deliberate course of conduct aimed at defaming and retaliating against Plaintiff-Relator by, among other acts, 1) concocting charges of scientific misconduct against Relator, 2) falsely attributing misconduct to him with the express purpose of terminating him, 3) investigating Plaintiff-Relator's sexual orientation for the "suspicion" of being "homosexual," 4) investigating Plaintiff-Relator for misappropriating WSU space by holding lab meetings after hours,   5) tainting the arbitration process to bar Plaintiff from receiving an unbiased hearing to fight his wrongful termination, and 6)  further disparaging him by publishing a commentary in the local newspaper on April 26, 2014 stating he is not credible, or trustworthy, and casting him in a negative light.

120.    Defendants wrongfully terminated Plaintiff-Relator in 2012, based on falsified data and without giving him his due process rights.[8]

121.    In further retaliation at Plaintiff's other employer, VA, WSU faculty working, also, at VA launched an investigation to discredit Plaintiff further by using the same WSU report claiming misconduct research.   Unfortunately, this WSU report was used to ultimately defame Dr. Kreipke at VA and lead to his termination there, as well.

122.    By virtue of Defendants wrongful termination and retaliation against Plaintiff-Relator, Plaintiff-Relator, has suffered damages and therefore is entitled to treble damages, civil penalties, and other relief available under the False Claims Act, 31 U.S.C. §§ 3729, *et seq.*

123.     As a result of the retaliation and wrongful termination, Relator has, also, suffered severe economic and noneconomic damages, including but not limited to, loss of salary and benefits,

---

[8] Defendant WSU also terminated Relator's entire staff, and also expelled them from their Ph.D track programs, thereby destroying the staff's futures as well.  This is despite there being no evidence the staff engaged in any wrong doing. (**Ex. R** – Affidavit of Kreipke).

damage to reputation and career, in addition to extreme mental and emotional distress, depression, anxiety, and sleepless nights.

### SIXTH CAUSE OF ACTION
**State Claim:**
**Retaliatory Discharge in Violation of Public Policy**

124.    Plaintiff-Relator hereby incorporates, repeats and realleges each allegation stated above, as if fully set forth herein.

125.    As shown above, Defendants, through their agents, servants, or employees, violated the False Claims Act and other applicable federal law.

126.    Relator refused to break applicable laws referenced above or violate the False Claims Act, when demanded of him by his superiors.

127.    Defendant WSU discharged the Relator in whole or in part for refusing to break the law, including the False Claims Act.

128.    As a direct and proximate result of Relator's refusal to violate the law, and as a result of Defendant's retaliatory discharge of Relator, he has been placed in financial distress, suffered loss of wages and benefits, loss of earning capacity, loss of the ability to work, and will suffer these losses in the future.

129.    As a direct and proximate result of Defendant's violations stated above, Plaintiff has suffered loss of position, reputation, and future earnings at the VA as Defendant's acts of retaliation extended to false claims of misconduct against Plaintiff at the VA.

130.    As a direct and proximate result of Defendant's violations stated above, Plaintiff has suffered depression, emotional and physical distress, mental and physical anguish, humiliation, loss of reputation and standing in the community, and embarrassment, and will suffer these problems in the future.

**WHEREFORE**, plaintiff requests judgment against Defendant, WSU, and in favor of Plaintiff for all damages sustained, economic and non-economic plus costs and attorney fees, in addition to any other relief the Court deems just and equitable.

### SEVENTH CAUSE OF ACTION

#### State Claim:
#### Defamation as to Defendant Wayne State University under MCLA 600.2911, et seq.

131.    Plaintiff-Relator hereby incorporates, repeats and realleges each allegation stated above, as if fully set forth herein.

132.    Defendant WSU's employee (and President), M. Roy Wilson made false statements attacking Plaintiff's truthfulness.

133.    Mr, Wilson stated that Plaintiff's claims have no merit, which is untrue.

134.    Mr. Wilson stated that Plaintiff "was investigated" by the Federal Office of Research Committee, which he knows should have known is not true as the actual alleged investigation was done by WSU Faculty (working also for VA), in further retaliation of Plaintiff refusing to sign off on fraudulent reports prepared by WSU, and for his findings that WSU's research policy was at odds with Federal policy.

135.    Mr. Wilson stated that Plaintiff challenged his termination 3 times, which is untrue, as he only challenged it once, and where Plaintiff's fate was decided by an arbitrator who did not fully disclose the extent of his financial relationship with WSU.

136.    Mr. Wilson stated that never once Plaintiff complained of the fraudulent activity, which is untrue.

137.    Mr. Wilson further stated that Plaintiff-Relator has no credibility by using a quote from a supposedly confidential arbitration, which allegedly stated that Plaintiff's ""credibility has been reduced to zero." *Id.*

27

138.    As stated above, and incorporated herein, Defendant WSU (through Mr. Wilson) made these statements to the entire Detroit Free Press readership, also, as further retaliation for Plaintiff reporting fraudulent activity.

139.    The accusations that Plaintiff-Relator is untrustworthy and a liar are false and defamatory.

140.    Defendant WSU negligently, or with actual malice published false and defamatory statements regarding Plaintiff-Relator, and the cause of his discharge.

141.    These defamatory statements have a tendency to and did undermine Plaintiff-Relator's professional reputation and held him out in disrepute.

142.    Defendant WSU's statements were not privileged.

143.    Defendant WSU's statements were defamation per se.

144.    The publication of these remarks damaged Plaintiff-Relator's reputation.

145.    The publication of these remarks caused Plaintiff-Relator emotional distress, humiliation, mortification, embarrassment, anxiety, and other damages that may arise during the course of discovery that are both economic and non-economic.

146.    The publication of these remarks caused Plaintiff-Relator  economic injury, loss of good will,  further harm to his reputation, loss of esteem and standing in the community, and loss of business opportunities.

147.    On April 28, 2014, Plaintiff-Relator's Counsel sent a letter to Mr. Wilson demanding that he, and WSU, retract his defamatory statements.  (**Ex. Z** – Letter to Wilson).

148.    Defendant WSU refused to retract any of their statements.

        **WHEREFORE**, Plaintiff-Relator respectfully requests this Court to enter judgment against Defendant, WSU and in favor of Plaintiff for all damages sustained as result of the

defamatory conduct, economic and non-economic in addition to exemplary damages and attorney fees as provided over under the Act, plus damages for loss of reputation, self-esteem and standing in the community

### IX.    PRAYER FOR RELIEF FOR THE FALSE ACT CLAIMS (Counts I-V)

**WHEREFORE**, for Counts I-V above and any other applicable count, Plaintiff-Relator respectfully requests this Court to enter judgment against Defendants as follows:

(a)    That the United States be awarded treble the amount of damages sustained because of Defendants' fraudulent activity and submission of false claims;

(b)    That civil penalties of $11,000 be imposed for each and every false claim presented by Defendants.

(c)    That pre-and post judgment interest be awarded;

(d)    That reasonable attorneys fees, costs and expenses, which the Plaintiff-Relator necessarily incurred in bringing the action, be awarded.

(e)    That the Court grants permanent injunctive relief to prevent any recurrence of the False Claims Act violations alleged herein.

(f)    That the Plaintiff-Relator be awarded between 15 and 25 percent of the recovery to the United States if the United States intervenes in the action or between 25 and 30 percent of the recovery if the United States declines to intervene as provided by the False Claims Act in addition to compensating Relator for his economic and noneconomic damages, including but not limited to, loss of salary and benefits, damage to reputation and career, plus extreme mental and emotional distress, depression, anxiety, and sleepless nights.

(g)     That the Defendant be ordered to take all necessary steps to restore Dr. Kreipke's

reputation in the scientific community, at large.

Respectfully submitted,

AKEEL & VALENTINE, PLC


__s/: Shereef Akeel_____
Shereef H. Akeel, Esq. P54345
Attorneys for Plaintiff
888 West Big Beaver Road, Suite 910
Troy, MI  48084-4736
Telephone: (248) 269-9595
Facsimile: (248) 269-9119

DATED:        June 5, 2014